108 T.C. No. 24


UNITED STATES TAX COURT


AMDAHL CORPORATION AND CONSOLIDATED SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2944-95.                          Filed June 17, 1997.


P paid relocation expenses of its employees and
provided financial assistance in connection with
the sale of their residences.  P contracted with
relocation service companies (RSC) to manage the
sale of the employees' residences.  The RSC paid
the employees their equity in their homes and paid
the costs of maintaining the residences, including
mortgage and property tax expenses, until third
parties purchased the residences.  P reimbursed the
RSC for its expenses and paid the RSC a fee.  The
relocating employees retained legal title to the
residences.  R disallowed a deduction to P for
certain payments to the RSC against ordinary income
and treated the payments as a capital loss.  R
argues that P acquired equitable ownership of the
residences.

Held: Neither P nor the RSC acquired legal or
equitable ownership of the residences for Federal

income tax purposes.  Held, further, P is entitled to deduct payments to the RSC as ordinary and necessary business expenses.  Sec. 162(a), I.R.C.

Frederick R. Chilton, Jr., Janet S. Bianchi, Paolo M. Dau, and John J. Steele, for petitioner.

Andrew P. Crousore and Ewan D. Purkiss, for respondent.

GERBER, Judge:  Respondent determined deficiencies in petitioner's Federal income tax as follows:

| Tax Year Ended | Deficiency |
| --- | --- |
| Dec. 30, 1983 | $25,528,729 |
| Dec. 28, 1984 | 6,245,206 |
| Dec. 27, 1985 | 4,394,198 |
| Dec. 26, 1986 | 4,038,178 |

After concessions, the issue for decision is whether payments made by petitioner to relocation service companies to assist in the disposition of the homes of its employees who relocate in connection with their employment are deductible against ordinary income or must be treated as a capital loss.

FINDINGS OF FACTS[1]

Petitioner is a Delaware corporation with its principal place of business in Sunnyvale, California.  It develops, manufactures, markets, and services large-scale computer systems, storage products, communications systems, software, and

_____

[1]The parties' stipulation of facts and the attached exhibits are incorporated by this reference.

educational services.  Petitioner also provides product and software support for its systems, engages in research and development, and provides consulting services.

During the years in issue, petitioner had approximately 6,600 to 7,200 employees worldwide, with about 70 percent of its employees in the United States.  Petitioner relocates both current and newly hired employees as its business needs dictate. Petitioner transfers employees to locations where it has installed mainframe computers to provide maintenance services to its customers.  Petitioner also relocates employees as it expands into new geographic markets to ensure that it has employees at the new location who are familiar with the company, its products, and its customers.

To induce employees to relocate, petitioner provides various kinds of employee benefits to assist in the move.  Petitioner reimburses employees for moving costs, including the costs of a house-hunting trip to the new location; shipment costs for household goods, personal effects, household pets, and family vehicles; certain expenses incurred en route to the new location; temporary living expenses; the costs of a return trip by the employee to the former location; and additional income tax incurred as a result of the relocation.  As part of its relocation program, petitioner also offers financial assistance to employees in the sale of their homes at their former locations and in the acquisition of new homes.  Petitioner has provided

various forms of home disposal assistance to relocating employees for the past 20 years. Petitioner's competitors in the computer mainframe business provide similar home disposal services to their employees.

Petitioner's employee relocation program is part of its human resource department and is administered by a relocation administrator under the supervision of a relocation manager. The relocation administrator provides information to relocating employees about available relocation benefits, including the home disposal assistance. The relocation administrator and manager also arrange for shipment of household goods, temporary lodging, and car rental, and reimburse employees for their moving expenses.

To assist employees in the sale of their homes, petitioner contracts with unrelated relocation service companies. Pursuant to petitioner's contract with a relocation service company (RSC), the RSC offers to purchase the residences of eligible relocating employees and resell the residences to third parties. Petitioner compensates the RSC for all costs incurred in assisting relocating employees in the sale of their homes and also pays the RSC a fee for its services. At various times during the years in issue, petitioner used either Transamerica Relocation Service, Inc. (Transamerica), VanRelco, Inc. (VanRelco), or Intergroup Management Co. and its successor, Associates Intergroup Management Co. (each, Intergroup) as its RSC. Generally,

petitioner's contracts with Transamerica, VanRelco, and Intergroup provide for substantially similar home disposal assistance.

When petitioner extends a relocation offer to an employee, petitioner informs the employee of its relocation benefits and gives the employee a brochure describing the relocation assistance that petitioner offers. The brochure provides that petitioner will assist in the sale of the employee's home with the aid of a "third-party agent". If an employee who is eligible for home disposal assistance agrees to a proposed transfer, petitioner notifies the RSC to offer to purchase the employee's home in accordance with petitioner's contract with the RSC. An employee's eligibility for home disposal assistance depends on criteria defined in petitioner's corporate policies and procedures. Petitioner does not take into consideration whether residences will appreciate in value in deciding to provide home disposal assistance to relocating employees. Petitioner has not based its decision to provide relocation assistance on whether employee residences will appreciate in order to offset the costs to petitioner for relocation.

In addition, the RSC does not have discretion over whether to purchase a particular employee's residence. The RSC must offer to purchase an employee's residence if the residence satisfies certain requirements set forth in petitioner's contract with the RSC. Eligible employees are not required to accept the

RSC's offer for the residences or to participate in the home disposal program. If a relocating employee decides to participate, petitioner becomes obligated to assist in the disposition of the employee's home.

Pursuant to the contract between petitioner and the RSC, the RSC offers to purchase relocating employees' residences at fair market value. Fair market value is determined by averaging two qualified, independent appraisals. The employees choose independent appraisers from a list provided by the RSC. If more than two appraisals are obtained, fair market value is the average of the two closest appraisals. The RSC sends copies of all appraisals to petitioner and informs it of the appraised value. The RSC's offer expires after a set period, which is generally 60 days.

Relocating employees may market their residences during this offer period. Employees who market their homes must insert language in the listing agreement that permits them to accept the RSC's offer without paying a commission to the listing broker. If an employee receives a bona fide third-party offer that exceeds the RSC's offer during the offer period, the employee may accept the third-party offer and assign the third-party contract to the RSC (assigned sale). The employee assigns the third-party contract by sending the following to the RSC: (1) An executed third-party offer, signed by the employee as seller and the third party as buyer; (2) a contract of sale with the RSC as buyer and

the employee as seller; (3) an assignment addendum to the contract of sale with the RSC; (4) a power of attorney; and (5) an authorization for the RSC to receive funds from trust accounts on the employee's behalf. After the assignment, the RSC handles all remaining details of the third-party sale and agrees to take all actions necessary and appropriate to complete the sale. The RSC pays seller's closing costs.

If an assigned third-party sale does not close and the RSC's offer has not expired, the employee may attempt to find another buyer during the remaining offer period and assign the sale to the RSC. If the RSC's offer has expired, the employee may accept the RSC's offer or cancel the contract of sale with the RSC and return all money received from the RSC. Petitioner is liable to the RSC for any amount not returned. During the years in issue, all assigned sales closed as provided in the third-party sales contracts.

Relocating employees who do not receive offers from third parties may accept the RSC's offer (regular sale) before it expires. An employee accepts the RSC's offer by completing a contract of sale with the RSC as buyer and the employee as seller, a power of attorney, and an authorization for the RSC to receive funds from trust accounts on the employee's behalf. In the contracts of sale, the RSC agrees to purchase and the employees agree to sell their residences. The employees do not transfer legal title of the residences to the RSC or petitioner.

The contracts of sale between the RSC and the employees require the employees to transfer marketable title of the residences within 1 year to a person designated by the RSC. Generally, the designated person is the third-party purchaser. If a third party has not purchased a residence within 1 year, title passes to the RSC or an affiliate of the RSC.

To facilitate the transfer of title to the third-party purchaser, the employee signs and delivers a deed in blank to the RSC when the employee accepts the RSC's offer. The deed in blank contains a legal description of the property and includes the relocating employee's signature as grantor and a notary acknowledgment. Everything else in the deed, including the name of the grantee, is left blank. Neither the deed nor the contract of sale with the RSC is recorded. The RSC will not return a deed to an employee unless told to do so by petitioner. The RSC holds the unrecorded deed until it finds a third-party purchaser for the residence. At that time, the name of the third-party purchaser is entered onto the deed as grantee. The relocating employee retains legal title to the residence until the sale of the residence to a third party.

Under the terms of their contracts of sale with the RSC, relocating employees generally vacate their residences within 60 days of accepting the RSC's offer. Under the Intergroup and VanRelco contracts of sale, employees who continue to occupy the residences after 60 days must pay rent. Employees are

responsible for maintenance of the residences until they move out. Thereafter, the RSC pays for the maintenance costs of the residences, including the costs of insurance, general property maintenance, utilities, snow removal, mortgage payments, and property taxes. However, employees remain legally responsible for the mortgage payments and taxes. In assigned sales, employees may elect to deliver possession of the residences directly to the third-party buyers rather than the RSC. If an employee delivers possession to the third-party buyer, the employee remains responsible for the maintenance costs until the third-party sale closes.

On the day the employees move out of the residences, the RSC pays them their equity in the residences. The RSC may pay up to a specified percentage (typically 90 percent) of the equity prior to the vacate date if an employee needs the money to purchase a new residence. In such a case, the RSC pays the balance of the employee's equity on the vacate date. In a regular sale, the equity payment is the appraised value of the residence as of the vacate date less the prorated unpaid balances of all loans secured by the property, prorated accrued interest, prorated real property taxes, prorated owner's dues, fees, and maintenance charges, and certain estimated costs of repairs recommended by a recognized termite or pest control company. In an assigned sale, the equity payment is computed using the appraised value as of the estimated closing date for the third-party sales contract.

When an assigned sale closes, the RSC pays the employee the difference between the equity payment and the net sales price from the third-party sale.

In a regular sale, the RSC lists the residence for sale through a real estate broker. The RSC recommends repairs, improvements, and maintenance that would expedite the residence's sale. Petitioner must authorize the repair or improvement, and the RSC makes the appropriate arrangements. The RSC also advises petitioner of its activities in connection with the sale of the residences and informs petitioner of any offers that it receives. Petitioner's contract with the RSC gives the RSC authority to reject or accept any bona fide third-party offer. Petitioner must approve any offers that are below a specified percentage (either 92 or 94 percent) of the appraised value. In practice, however, the RSC consults with petitioner and follows petitioner's recommendations regarding all third-party offers.

In general, the RSC sends the net sales proceeds from the third-party sale to petitioner when the sale closes. If a third party purchases the residence at a price below the appraised value, the RSC charges the loss from the sale to petitioner's account. Conversely, the RSC credits a gain from a third-party sale to petitioner. Petitioner then pays the gain to the employee who owns the residence.

Petitioner reimburses the RSC for the equity payments and for all costs that the RSC incurs in connection with the

disposition of relocating employees' residences.  Reimbursed costs include expenses for:  appraisal and inspection, repair and maintenance, improvements, utilities, insurance, property taxes, homeowner association fees, mortgage payments, other expenses directly attributable to specific residences, interest charged on direct and indirect expenses, gain or loss on the sale to third parties, broker commissions, and other closing costs.  In addition, petitioner pays the RSC a fee of 1.25 percent of the appraised value of the residences in regular sales, and either .5 percent (Intergroup) or 1 percent (Transamerica and VanRelco) of the appraised value in assigned sales.  The RSC bears no risk of loss in connection with the sale of the residences.

During the years in issue, petitioner provided home disposal assistance to at least 188 employees, 176 of which are in issue. Approximately 74 percent of the home sales in issue were regular sales, and 26 percent were assigned sales.  Petitioner did not intend to acquire legal title to the residences.  It viewed the costs associated with assisting relocating employees in the sale of their residences as an expense of conducting its computer business and did not intend to profit from the sale of the residences to third parties.  Petitioner was primarily concerned with inducing employees to relocate and ensuring that the residences were sold quickly.  Petitioner generally does not hold

itself out as the owner or purchaser of the employees' residences.[2]

For regular sales during the years in issue, the average length of time between acceptance of the RSC's offer and passage of title to the third-party purchaser was as follows:

| Year | Holding Period Days |
|------|---------------------|
| 1983 | 102 |
| 1984 | 159 |
| 1985 | 186 |
| 1986 | 147 |

For assigned sales during the years in issue, the average length of time between assignment of the third-party contract to the RSC and passage of title to the third-party purchaser was as follows:

| Year | Holding Period Days |
|------|---------------------|
| 1983 | 44 |
| 1984 | 44 |
| 1985 | 44 |
| 1986 | 54 |

During the years in issue, gross proceeds from sales of residences to third parties in regular and assigned sales were as follows:

---

[2] Respondent offers a single document, a letter written by petitioner's relocation administrator to a mortgage company, to support the contention that petitioner holds itself out as the purchaser of employee residences. The letter identifies petitioner as purchasing an employee's home and paying the employee his equity in the residence. However, petitioner did not normally write letters of this type and typically referred inquiries by mortgage lenders to the relocation service company (RSC). We give little weight to the letter as no other evidence indicates that petitioner held itself out to third parties as the owner of the residences.

| Year | Gross Sales Proceeds |
|------|---------------------|
| 1983 | $4,762,863 |
| 1984 | 5,583,176 |
| 1985 | 5,919,630 |
| 1986 | 4,941,356 |

Petitioner did not report any portion of the sales proceeds as gross receipts on its income tax returns for the years in issue. Petitioner deducted certain payments to the RSC as ordinary and necessary business expenses, including the loss from sales of residences to third parties at a price below the appraised value. Respondent disallowed the deduction against ordinary income on the ground that the payments were capital losses. Respondent increased petitioner's taxable income in the following amounts:[3]

| Year | Increase |
|------|----------|
| 1983 | $227,208 |
| 1984 | 733,953 |
| 1985 | 707,805 |
| 1986 | 490,134 |

Petitioner did not report any capital gain or loss during the years in issue.

OPINION

Petitioner contends that its payments to the RSC to assist relocating employees in selling their residences are a form of

---

[3] Respondent's determination is expressed as a single adjustment for each taxable year in issue. In the determination, respondent treated petitioner as the owner of the residences and treated certain payments to the RSC as capital rather than ordinary income items. However, it is not clear from the briefs or record how respondent computed the adjustment to petitioner's taxable income and which relocation expenses were disallowed. Because of our conclusion that petitioner is not the owner of the residences in either substance or form, it is unnecessary for us to analyze that aspect of the adjustment.

employee benefits and are fully deductible under section 162(a).[4]
Section 162(a) allows a deduction for ordinary and necessary
expenses paid or incurred during the taxable year in carrying on
a trade or business. Sanford v. Commissioner, 50 T.C. 823, 826
(1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969). Losses
from the sale of capital assets by corporate taxpayers are
deductible only to the extent of capital gains. Secs. 165(f),
1211(a). Deductions are a matter of legislative grace, and
taxpayers bear the burden of proving that they are entitled to
the deductions claimed. Rule 142(a); INDOPCO, Inc. v.
Commissioner, 503 U.S. 79, 84 (1992).

Respondent contends that petitioner acquired ownership of
the residences of its relocating employees in both regular and
assigned sales and that in petitioner's possession the residences
are capital assets. Accordingly, respondent argues that
petitioner cannot deduct the payments to the RSC against ordinary
income under section 162. Although petitioner never took title
to its employees' residences, respondent determined that in
substance petitioner, by its control over the property, was the
owner. Respondent's position thus follows the ruling position
that relocating employees' homes purchased by their employer to
assist the employees in the sale of the residences are capital

---

[4] All section references are to the Internal Revenue Code in
effect for taxable years in issue, and all Rule references are to
the Tax Court Rules of Practice and Procedure, unless otherwise
indicated.

assets under section 1221 when resold by the employer. Rev. Rul. 82-204, 1982-2 C.B. 192. Respondent infers that petitioner structured these relocation transactions to convert capital loss into deductions against "ordinary" income. To determine whether petitioner is entitled to deduct the payments to the RSC, we first address the threshold question of whether petitioner acquired ownership of the residences. If petitioner were found to be the owner of the residences, we would then need to determine whether the residences were capital or ordinary income assets.

The economic substance of a transaction, rather than its form, controls in determining whether the transaction constitutes a sale for Federal tax purposes. Gregory v. Helvering, 293 U.S. 465 (1935); Derr v. Commissioner, 77 T.C. 708 (1981). We consider the objective economic realities of a transaction to determine its tax consequences. Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978); Houchins v. Commissioner, 79 T.C. 570, 589 (1982). Whether petitioner became the owner of the residences for Federal tax purposes is a question of fact to be determined from the written agreements and all relevant facts and circumstances. Reinberg v. Commissioner, 90 T.C. 116, 132 (1988); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981). Respondent argues that the transactions between the RSC and relocating employees constitute sales of the employees' residences to the RSC. Respondent further contends that the RSC

acted as petitioner's agent, making petitioner the owner of the residences. Petitioner denies that the RSC was its agent and asserts that the RSC was the agent of relocating employees to transfer ownership of the residences from the employees to third-party purchasers.

The term "sale" is given its ordinary meaning and is generally defined as a transfer of property for money or a promise to pay money. Commissioner v. Brown, 380 U.S. 563 (1965). For Federal tax purposes, State law controls whether a taxpayer has an ownership interest in property, and the tax consequences of property ownership are then determined under Federal law. United States v. National Bank of Commerce, 472 U.S. 713, 722 (1985). However, a sale occurs for Federal tax purposes upon the transfer of the benefits and burdens of ownership rather than upon the satisfaction of technical requirements for the passage of title under State law. Yelencsics v. Commissioner, 74 T.C. 1513, 1527 (1980); Clodfelter v. Commissioner, 48 T.C. 694, 700 (1967), affd. 426 F.2d 1391 (9th Cir. 1970).

Whether the benefits and burdens of ownership have been transferred is a question of fact. In Grodt & McKay Realty v. Commissioner, supra, we identified the following factors to consider in determining whether a transaction constitutes a sale:

> (1) Whether legal title passes; (2) how the
> parties treat the transaction; (3) whether
> an equity was acquired in the property;

> (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. * * * [Id. at 1237-1238; citations omitted.]

Although passage of a title is not determinative, it is an important factor in whether a sale has occurred. Harmston v. Commissioner, 61 T.C. 216, 229 (1973), affd. 528 F.2d 55 (9th Cir. 1976); Ryan v. Commissioner, T.C. Memo. 1995-579. Relocating employees delivered signed deeds to the RSC that omitted the names of the grantees. The employees authorized the RSC, by a power of attorney, to fill in the grantees' names. Respondent concedes that petitioner did not acquire legal title to the residences. Title remained with the relocating employees and passed directly to the third-party purchasers.

As petitioner did not acquire legal ownership of the residences, we must determine whether it acquired beneficial ownership of the residences. Deyoe v. Commissioner, 66 T.C. 904, 910 (1976). We find that petitioner did not acquire beneficial ownership of the residences. In part, respondent's argument that petitioner owned the residences is based on an agency relationship existing between petitioner and the RSC. Respondent cites petitioner's relocation brochure which refers to the RSC as a third-party agent as evidence of the agency relationship

between petitioner and the RSC. The contractual terms defining the relationship between petitioner and the RSC coupled with petitioner's reimbursement of RSC expenses does not provide a sufficient basis to find that the RSC was an agent of petitioner for the purpose of acquiring real property. If the RSC was an agent, it would be the agent of relocating employees because the RSC had authority to transfer ownership to third-parties by filling in the names of grantees on the deeds in blank. There is no legal basis to find that, in substance, the RSC acted as petitioner's agent. Even if we found the RSC to be petitioner's agent, there would be no enforceable way for petitioner to control the agency relationship without a writing that satisfies the Statute of Frauds. A determination that the RSC was petitioner's agent would be substance without reality. However, we find that the RSC did not acquire beneficial ownership of the residences, and we do not need to rely on the lack of an agency relationship between petitioner and the RSC in our decision that petitioner is not the owner of the residences.

Nothing in the record indicates that the parties treated the transaction as a sale between the RSC and relocating employees. Petitioner purposefully structured the financial assistance it provided to relocating employees in the sale of their homes to avoid taking legal title to the residences. The parties did not intend to transfer ownership of the residences through the contracts of sale. In addition, there is no evidence that

petitioner intended to acquire legal title to the residences at some future time. Petitioner generally did not hold itself out as the purchaser or owner of the residences.

Respondent contends that the parties entered into binding contracts for the sale of the residences. Respondent relies on language in the contracts of sale that identifies the RSC as the purchaser and the employees as the sellers and provides that the RSC agrees to purchase and the employees agree to sell the residences. However, the RSC's obligation to purchase the residences was conditional, and the contracts of sale were executory in nature. The contracts of sale did not purport to convey ownership of the residences to either petitioner or the RSC. Although in some circumstances an executory contract may constitute a sale for Federal tax purposes, this is not one of them.[5]

Relocating employees did not have a present, legally enforceable right to compel the RSC to purchase the residences. Under the terms of the contract of sale, a relocating employee agreed to convey title to the residence at the RSC's request to the RSC or a person it designates. The contracts delayed passage of title to the RSC for 1 year from the date the parties entered

---

[5] Even if the RSC is considered the buyer, the RSC's relationship with petitioner will not ipso facto result in the ownership's being attributed to petitioner for Federal tax purposes.

into the contracts. Title passed to the RSC only if a third party did not purchase the residence within that year. Thus, the RSC did obtain the present right to acquire title to the residences. We find that the parties treated the transactions as resulting in possible future sales of the residences to the RSC and not as completed, present sales.

The contracts of sale did not require the RSC to pay the full purchase price of the residences. Under the terms of the contracts of sale, the purchase price of a residence was its appraised value. The RSC was not obligated to pay the full purchase price and only paid the employees their equity in the residences, which was defined as the appraised value less unpaid mortgages, real property taxes, and other expenses associated with the residences. Neither petitioner nor the RSC assumed personal liability for the mortgages on the residences. Rather, the RSC agreed to make mortgage payments and pay other costs of ownership from the vacate date until a third-party sale occurred. Petitioner reimbursed the RSC for these costs.

Respondent contends that the equity payments were sufficient to give petitioner an equity interest in the residences. We disagree. The equity payment did not give petitioner the opportunity to benefit as the owner of the residences through appreciation in the residences' value. Relocating employees received the appreciation in the residences' value realized from the third-party sales. Generally, the RSC paid the employees

their equity in the homes on the vacate date.  In assigned sales, the RSC paid the difference between the equity payment and the final sales price from the third-party sale directly to the employees when the third-party sales closed.  In regular sales, the RSC credited any gain from a third-party sale to petitioner's account.  Although not contractually obligated to do so, petitioner paid the gain to the employee who owned the residence. Respondent argues that petitioner did not in fact pay the gain over to the employees as it claims.  However, we find no reason to doubt petitioner's contention.  As petitioner did not profit from the sale of the residences, it is difficult for us to say that it was purchasing an ownership interest with the equity payments.  At best, petitioner could recover the payments if the residences sold to third parties at their appraised values.

In addition, petitioner's actions with respect to the residences were inconsistent with those of an owner.  Petitioner was not interested in the home's long-term appreciation.  It was concerned with quick sales of the residences even if the sales were at below the appraised value.  Petitioner viewed the costs of the home disposal program as an expense of conducting its mainframe business and not as an investment in real estate. Petitioner paid the costs of home disposal, as well as other relocation costs of its employees, to induce employees to move and to speed the relocation process.

The real benefit that petitioner received was the transfer of employees to locations as required by its computer business. The transactions were structured to encourage employees to accept petitioner's offer to transfer. The contracts of sale gave petitioner a means to provide relocating employees their equity in their residences before the residences were sold. This enabled relocating employees to purchase new residences with a minimum of delay. The contracts also relieved relocating employees of the duplicate burden of paying the costs of a mortgage, property tax, and other costs of home ownership for both their new and former residences. However, relocating employees were still legally responsible for the mortgage and tax expenses of their former residences. Payments on the mortgages or for other expenses relating to property ownership were for the benefit of relocating employees and not for petitioner to acquire an equity interest in the residences. The purported sales were nothing more than a way for an employer to subsidize the costs of its employees' transfers.

As part of the relocation program, petitioner protected its relocating employees from the risk of loss on the sale of their residences. The equity payments were not contingent on the sale of the residences to third parties, and petitioner assumed the risk of loss on the sale. Although petitioner assumed certain risks of loss in connection with its employees' residences, in substance, we find that petitioner was reimbursing the costs of

employees' relocations. In addition, any risks of loss that petitioner was subjected to were insignificant in comparison to the primary motives of petitioner. Petitioner's financial stake in the residences was limited and consisted of the maintenance costs and equity payments. Petitioner was indemnified for the equity payments and maintenance expenses from the proceeds of the sale to third parties. The residences were generally sold to third parties within a few months of the contracts of sale, and maintenance expenses paid by petitioner during that short time were small in comparison to the residences' value. In addition, the equity payments were based on the residences' appraised value. The risk that the residences could not be sold at their appraised values, although controlled by market conditions, is insufficient in this setting to reach the conclusion that petitioner, in substance, became the residences' owner for Federal tax purposes.

As noted by respondent, relocating employees gave up the right to use the residences and control their disposition. Relocating employees had no say in the decision to accept third-party offers after entering the contracts of sale. Petitioner acquired control over the disposition of the residences. Pursuant to the terms of the RSC contract, the RSC had authority to accept or reject any offer within a specified percentage of the residences' appraised value. In practice, however, the RSC consulted with petitioner over whether to accept or reject a

particular offer, and petitioner made all decisions regarding the disposition of the residences. Petitioner did not have a contractual right to dispose of the residences or to convey the residences to itself. Petitioner's control over the residences does not make it the owner of the residences. When a property owner grants an option to purchase property, the owner may relinquish control over the disposition of the property but retain ownership of the property until the option is exercised. See Penn-Dixie Steel Corp. v. Commissioner, 69 T.C. 837, 844-845 (1978).

We view petitioner's control over the residences to be a form of security for petitioner to control the amount of its relocation expenditures. The purpose of the deed in blank was to facilitate the sale to a third party because many employees moved to the new location before the third-party sale occurred. It was not the purpose of the deed in blank to enable the RSC to gain title to the property. The contracts of sale also protected petitioner so that it would be indemnified for its equity and maintenance payments. To that end, the contracts of sale provided that in the event that the employees defaulted, the equity payment was refundable. Upon refund of all money received from the RSC, the contracts of sale would terminate. The default and termination provisions are inconsistent with the acquisition of equitable ownership of the residences. We find that

petitioner's control over the residences was not as the owner of the residences.

In addition, relocating employees, not petitioner, controlled the disposition of the property in assigned sales. Relocating employees decided whether to accept the third-party offers. If a third-party sale fell through, the employee retained the power to dispose of the residence. The employee could cancel the contract of sale with the RSC. Respondent would have us characterize the assigned sales as purchases of the residences by petitioner subject to possible repurchases by relocating employees if the assigned third-party sales fell through. At no time did petitioner control the disposition of the property. Respondent's characterization of assigned sales takes substance over form to the extreme, which we refuse to do.

After a careful review of the transactions in their entirety, we find that petitioner did not acquire beneficial ownership of the residences of its relocating employees. Although some aspects of the agreements between the RSC and relocating employees support respondent's contention, the most significant factors in this case, relocating employees' retention of legal title, the intent of the parties, the executory nature of the contracts of sales, and the employees' receiving any profits from the sale to third parties, demonstrate that relocating employees retained the benefits and burdens of ownership of the residences. Under the facts and circumstances

of this case, petitioner was not the owner of the residences of its relocating employees for Federal income tax purposes in either regular or assigned sales.

Having decided that petitioner is not the owner of the homes, we decide petitioner is entitled to deduct the payments to the RSC under section 162(a) as ordinary and necessary business expenses. An ordinary and necessary expense is one that is appropriate and helpful to the taxpayer's business and that results from an activity which is a common and accepted practice. Boser v. Commissioner, 77 T.C. 1124, 1132 (1981). Section 162(a) permits a deduction for reasonable compensation, including employee benefits. Sec. 1.162-10(a), Income Tax Regs. Petitioner relocated its employees to satisfy business needs and provided home disposal assistance to induce its employees to accept its offer of relocation. Petitioner's competitors in the mainframe computer business provided similar assistance to their employees. The payments to the RSC are similar to reimbursement of moving costs which are deductible business expenses. Respondent did not dispute that in the event we found petitioner not to be the owner of the residences of its relocating employees, the payments to the RSC were ordinary and necessary business expenses. We find that the payments to the RSC conferred employee benefits to relocating employees and are deductible business expenses under section 162(a).

Decision will be entered

under Rule 155.