T.C. Memo. 2012-331

UNITED STATES TAX COURT

STEPHEN M. GAGGERO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21378-03.                    Filed November 29, 2012.

<u>David Blake Chatfield</u>, for petitioner.

<u>John D. Faucher</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Stephen Gaggero is a self-made man and a successful real-estate developer, who in the '90s bought and moved into a rundown beach house in Malibu that became a splendid mansion.  The house was his primary residence while he upgraded it, and he was still living there when it was sold for at

[*2] least three times its initial value. But before he began the upgrades, he signed a deal with Blanchard Construction Company (BCC). BCC was in the real-estate development business, and the essential part of the deal was that BCC would get an equal share in any increase in the property's value between the time the deal was signed and the time the property was sold to a third party. Although Gaggero would pay most of the costs of the project renovations, BCC would provide the development services and get its half-interest in the increase if it completed its work.

BCC completed its work in February 1997, and the house was sold a few weeks later. The Commissioner's problem is that BCC is wholly owned by Gaggero. He disputes Gaggero's tale of a conveyance to BCC, and contends that the property remained entirely in Gaggero's hands. To him, Gaggero's deal with BCC is just a scheme to avoid recognizing capital gain.

FINDINGS OF FACT

Stephen Gaggero grew up with the name Stephen Blanchard, and only changed it when he was reunited with his natural father. He did not have a carefree boyhood, and dropped out of school in the tenth grade. He earned his living first as a handyman in Greater Los Angeles until a movie studio hired him as a carpenter. He was good at what he did, and movie people began hiring him--

[*3] first to work on their homes, and then to build them.  He saved his money, bought land, and became a developer.  He continues to develop and manage real estate today.

BCC was the corporation that Gaggero formed in 1976 to carry on his business, and he was its sole owner and president at least between 1991 and 1997.  In its heyday BCC had as many as 40 people working for it; in the early '90s that number was in the teens.  BCC even had its own in-house counsel and accountants, in addition to a construction superintendent, laborers, decorators, and designers.

This case's origins go back to 1990, when Gaggero bought two adjoining parcels of land on the beach side of the Pacific Coast Highway in Malibu, California.  It was during one of Southern California's periodic real-estate busts, and Gaggero thought he saw a great potential gain if the next boom sounded soon enough.  Only one of those two parcels is at issue in this case, but even in that relatively depressed market it was still worth about $3 million.  But Gaggero saw potential value far greater than the rundown house that then sat on the land.  He also looked for a way to finance the improvements that he wanted to make, and wanted to save on any final tax bills should his vision prove true.  So, before closing, he consulted with his accountant, James Walters, on how to structure the

**[*4]** purchase and development of the property. He had worked with Walters for several years. He trusted Walters, regarded Walters as entirely competent (Walters was a CPA), and usually took his advice.

Acting at Walters' suggestion but certainly contributing to the script with his own experience, Gaggero as individual signed a Land Contract Purchase and Sale Agreement and a Development Contract (Sale Agreement) with BCC. According to this Sale Agreement, BCC would develop the property in exchange for an interest equal to half the increase in its value less the costs of sale. The Sale Agreement specified the property's value as $3 million and said that BCC would not receive its interest unless and until it finished its work or the property was sold. Gaggero then moved into the house and made it his primary residence while BCC performed the development work. BCC redesigned, rebuilt, and expanded the house and grounds-- adding amenities such as a small golf course, stadium tennis court, new pool and secret pathway that wound from the home through the woods to a private beach-- and Gaggero personally paid approximately $1.5 million for the cost of these improvements.[1]

---

[1] BCC was responsible for the design, planning, permits, and day-to-day management of the project. It hired both subcontractors and independent contractors to perform the work. Gaggero paid many of the project costs--e.g., the materials, supplies, and outside labor needed to complete the renovations--either

(continued...)

**[*5]**   The project took years, but led to a boffo beachfront beauty of a home that attracted international attention.  BCC finished its work in February 1997 and the property was sold for $9.6 million in March 1997 to Monticello Properties, S.A., a Luxembourg corporation founded by a successful Flemish biochemist.  To close the deal, Gaggero executed a grant deed, a sales agreement, and a bill of sale--all of which he signed as an individual with no mention of BCC.  Gaggero reported $6.6 million from the sale on Form 2119, Sale of Your Home, as part of his 1997 individual tax return, but he didn't recognize any capital gain.[2]  BCC also reported

---

[1](...continued)
directly or by reimbursing BCC.  Gaggero didn't pay BCC in cash for its development services--BCC's payment was the part-ownership interest it would obtain upon completion of its services.

[2] Gaggero purchased a replacement house for $6.7 million within two years, and deferred his gain under then-section 1034.  Before its repeal, section 1034 provided that a taxpayer could completely defer recognition of gain on the sale of his principal residence if (1) within two years before or two years after the sale he purchased a new residence and used it as his principal residence; and (2) the adjusted sales price of the old residence did not exceed the cost of the new residence.  See sec. 1034(a) and (b) (before the Taxpayer Relief Act of 1997 (TRA 1997), Pub. L. No. 105-34, sec. 312(b), 111 Stat. at 839).  If the adjusted sales price of the old residence was greater than the cost of the new residence, the taxpayer would recognize gain on the sale of the old residence only to the extent the adjusted sales price exceeded the cost of the new residence.  Id.  As we will discuss later, what exactly the adjusted sales price of the "old residence" was is at issue here.  Congress repealed section 1034 in 1997 and amended section 121 at the same time to allow all taxpayers to exclude from income up to $250,000 ($500,000 for taxpayers filing joint returns) of gain from the sale of a principal
(continued...)

[*6] over $3 million of ordinary income (but no capital gain) on its corporate return for that year.[3]

The Commissioner began an audit of Gaggero's returns for several years, but in the end focused on this old 1997 deal, determining a deficiency on two theories. Under the first, the Commissioner determined that Gaggero should have reported the full $9.6 million sales price on his individual return. This argument is based on the premise that Gaggero never in fact sold any part of the property to BCC, at least not in any way that the Code would recognize as a sale. He argues that BCC's interest was only that of a lienholder, little different from that which any contractor who works on a house could get to ensure payment for his work. If he's right, Gaggero should have reported the entire $9.6 million sales price himself. That $9.6 million sales price was $2.9 million greater than what Gaggero paid to purchase his new home. Thus, according to the Commissioner, Gaggero

---

[2](...continued)
residence. See TRA 1997 sec. 312(a) and (b), 111 Stat. at 836-39. (Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue.

[3] Gaggero says that $3 million of BCC's ordinary income resulted from the proceeds it received from the Monticello sale. We think it more likely than not that he's telling the truth, since his testimony was corroborated by Walters and a 1099 statement that is consistent with the gross sales figure on two pages of BCC's corporate tax return that made it into the record.

[*7] should recognize $2.9 million of gain on the Malibu property (the difference between the adjusted sales price of the Malibu property and the cost of his new residence).[4]

Gaggero argues the Commissioner is wrong to think that BCC's interest was just a sort of mechanic's lien. He contends that BCC acted as a developer and, consistent with the norms of that industry, charged not for the value of its services, but for the increase in the property's value that its work created. According to Gaggero, this means there was a true sale to BCC when BCC finished its work in February 1997.

Even if Gaggero wins on the first issue, however, it doesn't necessarily mean that he is home free. The Commissioner also argues that if Gaggero actually sold a portion of his house to BCC, he needed to report two transactions on his return: (1) the sale to BCC for $3 million in February 1997; and (2) the sale to Monticello for $6.6 million in March 1997. Gaggero, however, didn't report that first sale on his return. Under this alternative theory, the Commissioner didn't

---

[4] The Commissioner calculated Gaggero's adjusted basis in the Malibu property to be $2.167 million, which resulted in a $7.433 million realized gain on the sale. After applying section 1034, the Commissioner acknowledged Gaggero would need to recognize only $2.9 million of that gain. The difference between the $7.433 million and $2.9 million would reduce Gaggero's basis in his new residence. See sec. 1034(e).

**[\*8]** allocate to Gaggero any basis for the sale to BCC, and thus asserts Gaggero should've reported a $3 million capital gain on that first sale. Although Gaggero now concedes that it might have been technically proper to report the two transactions on the return, he has two problems with the Commissioner's determination. First, he argues that the fact that he didn't report the two transactions separately was harmless because the two taxpayers (Gaggero and BCC) together did report the full $9.6 million sales price: the $3 million reported by BCC on its return and the $6.6 million on Gaggero's. Second, if there was a sale to BCC in February 1997, the Commissioner should have "account[ed] for his increase in basis."

If the Commissioner wins on his second theory, we then need to assess the interplay of section 1034 and those two sales. If section 1034 doesn't save Gaggero from a deficiency for 1997, we then need to determine whether he is liable for an accuracy-related penalty under section 6662.[5]

---

[5] Because we decide this case on a preponderance of the evidence, we need not decide whether the burden of proof shifts to the Commissioner under section 7491.

[*9]                                    OPINION

I.    Did Gaggero Sell an Interest to BCC in February 1997?

We start by looking at Gaggero's evidence that he sold an interest in the house to BCC. The most important evidence is two documents dated May 14, 1991--the Sale Agreement and BCC's company resolution signed by Gaggero twice--once as the individual selling the house and another as the president of BCC. The Sale Agreement states that BCC will provide "expertise, supervision labor, permanent and temporary facilities, support staff, insurance, preliminary and final feasibility studies, budgets, break downs, schedules * * * to obtain all entitlements and permits * * * to completely design, develop, remodel, construct, landscape, decorate and manage" the property in exchange for a 50% fee-simple ownership interest of the house's value less $3 million. BCC's interest would vest upon completion of its work on the property or the property's sale to a third party, whichever came first. The company resolution authorized Gaggero, as president of BCC, "to execute all agreements as necessary" regarding the development of the property.

This all looks pretty good for Gaggero's theory. But the Commissioner tells us to focus instead on the documents that Gaggero gave to Monticello and the State of California in 1997, which list Gaggero as sole owner and don't mention

**[*10]** BCC as owner of any interest in the property. These documents include a grant deed, sales agreement, bill of sale, owner's declaration, and Form 1099S issued by Chicago Title Company to Monticello. Each of these reports only Gaggero as the property's owner. They even refer to him as "a single man as his separate property," "an individual as seller," and "an individual [who] hereby sells."

The Commissioner argues that Gaggero cannot disavow the form of his sale to Monticello, and that Gaggero's signature on the Monticello sale agreements is strong evidence that whatever BCC got was not true co-ownership. He also contends that Gaggero consciously decided to deny the existence of BCC in the Monticello sale documents, and to structure BCC's interest as a lien, not a fee. And he is of course able to point out a great many cases where a taxpayer gets stuck with the tax consequences of his chosen form of transaction.

Which documents prevail? Form does not always tell us whether a deal is a sale or something else under the Code. We look for the objective economic realities of a transaction in order to determine whether there was a sale for tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978); Houchins v. Commissioner, 79 T.C. 570, 589-90 (1982). Things get more complicated, though, because we have to look at state law to figure out if a taxpayer or other

**[*11]** party has an ownership interest in property. <u>United States v. Nat'l Bank of Commerce</u>, 472 U.S. 713, 722 (1985). The pithy way of saying this is that state law defines property rights, but federal law defines their tax consequences.

When deciding whether a deal is a sale, we ask whether the benefits and burdens of property ownership have passed (or, in a case like this, become shared). This is a question of fact determined by examining the written agreements and all the relevant facts and circumstances. See <u>Amdahl Corp. v. Commissioner</u>, 108 T.C. 507, 517-18 (1997); <u>Reinberg v. Commissioner</u>, 90 T.C. 116, 132 (1988); <u>Grodt & McKay Realty, Inc. v. Commissioner</u>, 77 T.C. 1221, 1236-37 (1981). We consider the following:

- whether legal title passed;

- the manner in which the parties treated the transaction;

- whether the buyer acquired an equity interest in the property;

- whether the buyer has any control over the property and, if so, the extent of such control;

- whether the buyer bore the risk of loss or damage to the property;

- whether the buyer received any benefit from the operation or sale of the property;

- whether the contract obligated the seller to execute and deliver a deed and the buyer to make payments; and

**[\*12]** •   whether the buyer had a right to possess the property or an obligation to pay property taxes.

See Grodt & McKay Realty, 77 T.C. at 1236-38.

We look at each.[6]

A. Did legal title pass?

The Commissioner emphasizes that title didn't pass to BCC and that even if it did, BCC must still hold it because title never passed from BCC to Monticello according to the recorded deed. We do find that Gaggero didn't reveal his agency relationship with BCC to Monticello. And even if Gaggero acted as BCC's agent, he cannot sign the documents to transfer an interest in real estate under California law without subscribing the name of the principal. See Cal. Civ. Code sec. 1095 (West 2007).

Gaggero argues in reply that according to the Sale Agreement title was to be passed automatically in a "self-executing" process once BCC completed its development work. Gaggero commenced negotiations with Monticello in late

---

[6] Multifactor tests can be hard to handle. See Menard, Inc. v. Commissioner, 560 F.3d 620, 623 (7th Cir. 2009) (Posner, J.) ("Multifactor tests with no weight assigned to any factor are bad enough from the standpoint of providing an objective basis for a judicial decision"), rev'g 130 T.C. 54 (2008). But we aren't juggling these factors; we're using them as possible light sources to shine on the question of whether the deal we're looking at is enough like the paradigm of a cash-for-property deal to transfer ownership to be reasonably considered a sale for tax law.

[*13] 1996, before BCC finished its work (which, remember, was a condition for BCC's receiving its interest in the house). It completed that work in early February 1997, and BCC passed a corporate resolution on February 8, 1997, to allow Gaggero to act as its agent in the sale to Monticello. Those negotiations involved many lawyers and realtors, became long and tedious, and the parties were not certain until the very end that the deal would close. Gaggero's presentation of the deed to Monticello without mentioning BCC was therefore reasonable.

But even if Gaggero's failure to mention BCC's interest to Monticello is reasonable, might it still make a difference? One way of answering this key question is to imagine what might happen if BCC had not been under Gaggero's control--would California law recognize its interest as that of a titleholder or only a mere lienholder?

California real-estate law considers substance over form. Bachenheimer v. Palm Springs Mgmt. Corp., 254 P.2d 153, 158-60 (Cal. Dist. Ct. App. 1953) (although the instrument is called a "lease," and the payments are called "rent," the transaction is a sale if fee title will eventually pass to the buyer-occupant); Moss v. Williams, 191 P.2d 804, 807 (Cal. Dist. Ct. App. 1948). According to California law, there are situations where legal title or deed will not reflect the parties' intent in a transaction. For example, under land-sales contracts, which are similar to the

**[\*14]** case before us, the seller holds legal title as security for the unpaid purchase price. See, e.g., Alhambra Redevelopment Agency v. Transamerica Fin. Servs., 261 Cal. Rptr. 248, 250-51 (Cal. Ct. App. 1989) (under land-sales contracts, "the seller only possesses legal title to the property" and "is considered to be nothing more than a trustee, holding the land in trust for the purchaser as security for the payment of the purchase price until a conveyance of the legal title to the vendee is finally made" (citation and internal quotation marks omitted)). If a third party owned BCC and wished to compel the documentation of the transfer of title it could have brought an action for declaratory relief or specific performance under the Sale Agreement at that time. The Ninth Circuit has held that the fact that certain documents contained different terminology is immaterial where the intent of the parties was plain, the purpose of the contracts was clear, and the tax consequences are therefore well settled. See Haggard v. Commissioner, 241 F.2d 288, 289 (9th Cir. 1956), aff'g 24 T.C. 1124 (1955). And the Supreme Court has long established that "formal written documents are not rigidly binding" in the field of tax law. Helvering v. F. & R. Lazarus & Co., 308 U.S. 252, 255 (1939).

Even if passage of title is required by California law, we have held that a transaction is a sale under federal tax law once there's been a transfer of the benefits and burdens of ownership--we do not wait for the technical requirements

**[\*15]** for the passage of title under state law to be satisfied.  See Amdahl Corp., 108 T.C. at 517; Yelencsics v. Commissioner, 74 T.C. 1513, 1527 (1980); Clodfelter v. Commissioner, 48 T.C. 694, 700-01 (1967), aff'd, 426 F.2d 1391 (9th Cir. 1970). We therefore conclude that this factor is not decisively against Gaggero's characterization of his deal with BCC as a sale, but doesn't much count in his favor either.  Title alone just doesn't illuminate much about BCC's and Gaggero's respective rights under the terms of their deal.

B.    How did the parties treat the transaction?

The Commissioner argues that Gaggero's hiding BCC's ownership interest from Monticello and failing to include BCC in the sale paperwork amounts to Gaggero's implicit denial that anything was transferred to BCC, and he concludes from this that BCC had no property right in the parcel.  But, as we've already described, other documents reflect a different understanding between the parties. Gaggero argues that these documents (some of them dating back to 1991) properly record the continuous understanding between the parties that if BCC developed the property it would share in the gain if the property were to be sold.

We think Gaggero has the better of this argument. We do find that he concealed BCC from Monticello, but only because he wanted the deal to get done and not because he was implicitly denying that BCC co-owned the property.  The

[*16] negotiations that led to the sale were long and delicate, but the closing was quick: Gaggero and Monticello signed the sale agreement on March 21, 1997, and escrow was over less than a week later. The parties disputed commissions throughout the deal, and Gaggero ended up indemnifying Monticello for some of the sale's commissions. We specifically find Gaggero credible when he testified that he feared the introduction of BCC as a part-owner would have jeopardized the sale. Once Monticello signed its deed, however, Gaggero did ensure that both BCC and himself as an individual were considered sellers in the escrow, closing-agreement, and tax-related documents.

The Commissioner would have us rely on a statement by Gaggero's lawyer in the deal--Jennifer Kilpatrick--that she erroneously assumed the $3 million payment to BCC was a loan repayment because BCC was the beneficiary of a deed of trust recorded on the property in January 1996 to secure payment of $7.5 million. On the contrary, we find that Gaggero recorded the deed of trust on the property in favor of BCC to protect BCC's interests in a number of Gaggero's properties. We also find that Gaggero's retention of a different lawyer to represent BCC and BCC's own reconveyance of the deed of trust once it received $3 million from escrow are persuasive evidence that the parties intended to follow the terms

[*17] of the Sale Agreement that required Gaggero to transfer part ownership to BCC.[7] We likewise find that Gaggero's retention of separate legal representation for himself and BCC strongly indicates that he was looking for an arm's-length transaction where each party's own interest was represented. Therefore, we weigh this factor in favor of Gaggero.

C.    Did BCC acquire equity in the property?

The Commissioner argues that BCC's shared investment risk was not a real-property interest. He also reminds us that Gaggero's adviser conceded as much during trial. We agree that BCC--just by signing the contract back in 1991--did not acquire any significant equity. But once it started work, things quickly changed: "One who contracts to purchase real property acquires an *equity* therein immediately on the signing of the contract to purchase and taking possession.

---

[7] According to the Commissioner, Gaggero committed a material misrepresentation of fact for the purpose of avoiding the transfer tax--a misdemeanor under Los Angeles, Cal., County Code section 4.60.170 (1967)--by not recording a deed showing a transfer from Gaggero of part ownership to BCC and then later omitting BCC from the deed to Monticello. Although the Commissioner is correct that the parties didn't record Gaggero's transfer of part ownership to BCC, we don't believe Gaggero was hiding BCC's interest for the purpose of avoiding the transfer tax. Payment of transfer taxes usually happens with recording, see Los Angeles, Cal., County Code section 4.60.120, and Gaggero credibly testified that the parties didn't record BCC's interest because it happened so close to the time of the Monticello deal. We therefore find that the parties' failure to record a deed and to pay the transfer tax on the transfer of part ownership to BCC aren't persuasive evidence of this factor.

**[*18]** This equity increases with every payment.  No comparison of the value of the realty and the amount of rental paid at any given time has any validity."  Oesterreich v. Commissioner, 226 F.2d 798, 803 (9th Cir. 1955).  We think this case is a lot like an installment sale, because BCC was pouring money and effort into the house for years after 1991.  Like a buyer under an installment-sale contract, BCC gradually increased the value of its conditional interest until it completed the work, which is when it became fully entitled to an equity right.  We need not try to figure out if and precisely when its *conditional* interest became an equity interest, but do find that by February 4, 1997--when it fulfilled the condition that it finish work--it did acquire equity in the property.

D.    Did BCC control the property?

One of the indicators that an asset has been sold is that control over that asset shifts to another party.  Corliss v. Bowers, 281 U.S. 376, 378 (1930).  The Commissioner argues that this factor weighs against Gaggero because he kept complete control over the house until he sold it.  The Commissioner therefore views the Sale Agreement as first a "construction contract" and BCC as merely a contractor.  Gaggero, says the Commissioner, held at all times the full right, power, and authority to sell and transfer the property as he saw fit.

**[*19]** The Commissioner stresses that Gaggero made the house his personal residence and the Sale Agreement made him responsible for all costs and income associated with it. The Commissioner also argues that the parties ensured Gaggero's control over the house would survive any loss of his control over BCC in the section of the Sales Agreement that bars BCC from making any decisions about the property without Gaggero's consent. We don't lay too much stress on this, however, because the Sale Agreement also ended Gaggero's veto power once BCC finished the development work and received ownership in the house. It also lasted only while Gaggero was still BCC's president. The latter part of section 3.6 of the Sale Agreement specifically notes that if Gaggero did not have more than 51% ownership in BCC or ceased to be its president, then all decisions should be mutually agreed upon in writing between BCC and Gaggero and all contracts concerning the property should be signed by both BCC and Gaggero. That section also states all agreements and documents concerning the house had to be signed by both BCC and Gaggero after BCC's interest vested. We find it especially telling that this agreement was devised six years before the Monticello sale, and it is strong evidence that Gaggero was not certain he would remain in control of BCC, and so took pains--as he said in testimony that we find credible--to make sure the agreement was at arm's length. We therefore weigh this factor in favor of

**[*20]** Gaggero's argument that he sold part ownership of the property to BCC upon vesting.

E.     Did BCC bear the risk of loss or damage to the property?

The answer to this question is that both Gaggero and BCC assumed some risk. According to section 3.4 of the Sale Agreement, Gaggero was responsible for insuring against loss, and BCC had to insure its work on the house and against any harm that its work might cause third parties. BCC had had twelve years of experience in the Malibu custom-home market, and the resources to develop the property to create its highest and best value for sale. Developing property on California's coast is not for the risk-averse, and features potential exposure to litigation with local governments and the California Coastal Commission.[8] See,

---

[8] Malibu may be especially difficult for property owners yearning to improve their land. See, e.g., William S. Banowsky, The Malibu Miracle 275-96 (2010) (discussing general sentiment of Malibu residents regarding construction of Pepperdine University's campus); id. at 280 ("Since the days of silent movies, Malibu meant serenity, privacy, no more cars on the highway, and no more construction on the hills."); id. at 293 ("Malibu is probably the most sophisticated place left on the planet without any public sewage disposal system, and that's no accident. A century of vigilance guaranteed it. Malibuites were among America's earliest environmentalists. Fifty years before ecologists became ubiquitous, Malibuites were national no-growth leaders. The 1950s popularized handwritten Pacific Coast Highway signs * * * proclaim[ed]: Small is Beautiful! Less is More! Not in My Backyard! No Sewer Here!"). In 2015 for the very first time Malibuites will be connected to a sewer as a result of state coercion, despite the stink raised by the locals. See Memorandum of Understanding Between City of Malibu &

(continued...)

[*21] e.g., Reddell v. Cal. Coastal Comm'n, 103 Cal. Rptr. 3d 383 (Ct. App. 2009); Charles A. Pratt Constr. Co. v. Cal. Coastal Comm'n, 76 Cal. Rptr. 3d 466 (Ct. App. 2008); LT-WR, LLC v. Cal. Coastal Comm'n, 60 Cal. Rptr. 3d 417 (Ct. App. 2007).  California also imposes liability on developers more generally, see 11 Harry D. Miller & Marvin B. Starr, California Real Estate, sec. 29:21 (3d ed. 2012), and Gaggero was concerned about liability risk both while BCC developed the property and after the sale to Monticello.  He wanted to insulate himself from that risk as an individual, and BCC was already an entity that he used in other development projects and which, as an established real-estate development corporation, could insure against liability claims at a lower cost.  This division of risk between BCC and Gaggero is entirely consistent with the behavior of other co-owners of property, and at the very least is not a factor to weigh against Gaggero.

---

[8](...continued)
Regional Water Quality Control Board, Los Angeles Region & State Water Resources Control Board Regarding Phased Implementation of Basin Plan Amendment Prohibiting On-Site Wastewater Disposal Systems in the Malibu Civic Center Area, available at http://www.malibucity.org/download/index.cfm/fuseaction/download/cid/17478/ (last visited Nov. 19, 2012).

**[\*22]** F.    <u>Did BCC receive any benefit from the property's operation or sale?</u>

This is the single most important factor in this determination.  As we've already found, BCC fulfilled its obligations under the Sale Agreement and so earned millions of dollars in income on paper when its property interest in the Malibu property vested in February 1997.  It was then able to receive $3 million in cash proceeds from that interest when the property was sold to Monticello.  Its earnings were, moreover, contingent on the market's fluctuations, not the costs it incurred in developing the property--a key distinction between equity and merely  being a lienholder.  <u>See, e.g.</u>, <u>Root v. Commissioner</u>, 220 F.2d 240, 241 (9th Cir. 1955) ("[T]he essential difference between a creditor and a stockholder is that the latter intends to make an investment and take the risks of the venture, while the former seeks a definite obligation, payable in any event") (citation and internal quotation marks omitted).  But the Commissioner nevertheless argues that BCC did not share the benefits of ownership during the development years, and contends that this is an indication that it had only a lien and not an equity interest.

The Commissioner is partly right:  Section 3.4 of the Sale Agreement, for example, states that Gaggero was "entitled to any income generated by the property, such as movie location income, or event income."  BCC also had no right to charge rent for the property because Gaggero had the right to maintain his

[*23] personal residence on the property, and it was Gaggero alone who was entitled to all the income-tax benefits relating to the property. Gaggero even agreed with the Commissioner on this front, and explained that since he occupied the property as his residence he paid the expenses and enjoyed the benefits.

We think, however, that we need to swing the light this factor shines away from the development phase and over to BCC's rights once it finished its work. The Commissioner argues that even *after* BCC's right in the property vested it had only an interest in the proceeds from the sale of the house, and that under Suhr v. Commissioner, T.C. Memo. 2001-28, 2001 WL 103451, at *3, an interest in those proceeds is not an ownership interest in the real property. The problem is that Suhr was about whether a taxpayer had an ownership interest in his former wife's house simply by virtue of his divorce decree, which gave him one-half of the proceeds from the sale of the house. This case does not involve a marital interest in proceeds.

The other problem with the Commissioner's argument is that the Sale Agreement provided that BCC's ownership interest would vest when it completed its services, and there was very little time between that date and the sale to Monticello. The Commissioner is right that the Sale Agreement gave Gaggero the operating income from the property; but on the facts of this case--where the

**[*24]** property wasn't a mall or office building, but only a private residence--we find that BCC's variable return on proceeds from a sale to a third-party is more salient than its lack of a right to share in foreseeably tiny operating income. This factor weighs especially heavy in Gaggero's favor.

G. Did Gaggero have an obligation to deliver a deed in return for payments?

The Commissioner argues that Gaggero had no obligation to deliver a deed to BCC. The Sale Agreement does define "Deed" as "a grant deed conveying title to the Property from [Gaggero] to [BCC]," and does say that either party "*may* record a Deed against the property" upon completion of BCC's services or the sale of the property. But we read this part of the Sale Agreement as making the recording of the deed, not Gaggero's obligation to execute one, optional with either party. Section 7.6 of the Sale Agreement specifically provides that "[i]n addition to any documents expressly referred to in this Agreement to be executed by any or all parties, all parties agree to execute any and all documents which might be required to implement the provisions of this Agreement."

The Commissioner also argues that BCC had no obligation to make payments on the debts Gaggero incurred to improve the property. But whether BCC made payments on debts incurred before its part-ownership interest vested is

[*25] irrelevant to this factor, which asks whether BCC made payments *in return for* its part-ownership interest. The Sale Agreement specified that BCC's purchase price was its services, which BCC did provide in exchange for its interest.

This factor also weighs in Gaggero's favor.

H.    Did BCC have a vested right of possession?

The Commissioner notes that BCC had no right to rent the house and did not have any right to even possess the house. This is not terribly important in a case like this one, because Gaggero is not arguing that he sold the property to BCC--he's arguing that he sold part-ownership to BCC. If he was arguing that he sold the entire property to BCC and still got to live there rent-free with the right to rent to another, that would certainly be a factor that counted against calling the deal a sale. But that he was conveying an immediate right to BCC to work on the property, and a promise to give it an interest when the work was done looks entirely consistent with his own characterization of the deal as an executory sale of a partial interest. If the Commissioner's argument is to be believed, BCC's interest in the property was nothing more than a lien because its only real value was the expectancy of payment on a sale to a third party.

The Commissioner is, again, partly right. He is right that what the parties called "fee ownership" during the development period was a mere contractual

[*26] right. During development the Sale Agreement gave BCC no right to occupy or to collect rent from the property. But the situation all changed when BCC finished its work. At that moment, BCC could transfer, take possession, or partition the property, and there is nothing in the Sale Agreement that could keep it from doing so. We therefore find that--after vesting--BCC could have done as it liked with its share of the property.

The Commissioner also views the fact that BCC relinquished authority over the property to Gaggero as an indicator that BCC didn't have true ownership. We disagree. BCC resolved on February 8, 1997, once its ownership interest had vested, that it would grant Gaggero power to act on its behalf to sell the property. Nevertheless, if a person other than Gaggero owned BCC, the Sale Agreement allowed BCC to transfer, dispose or even exercise its right to partition the house under California law. See Cal. Civ. Proc. Code sec. 872.710(b) (West 1980); see also Am. Med. Int'l Inc. v. Feller, 131 Cal. Rptr. 270, 273 (Ct. App. 1976). Although a right to partition is not by itself sufficient proof of ownership, Schwartz v. Shapiro, 40 Cal. Rptr. 189, 199 (Ct. App. 1964), we think it undermines the Commissioner's characterization of BCC as a mere lienholder.

This is also a factor weighing in Gaggero's favor.

[*27] I.     Which party pays the property taxes?

The Sale Agreement states in section 3.4 that Gaggero is responsible for all costs associated with the property, including the obligation to pay property taxes while BCC was developing the property.  And Gaggero admitted that he himself paid property taxes.  Gaggero argues, however, that property taxes are not that relevant in this case.  We agree.  There was so little time between BCC's completion of its work and the sale to Monticello that neither BCC nor Gaggero had to pay property taxes during that timeframe.

J.     Conclusion

We find that BCC was a co-owner of the property before the sale to Monticello.  On completion of its development work, BCC had a share of the benefits and burdens in the property and received part-ownership in the property.  We accept Gaggero's explanation that disclosure of BCC's interest to Monticello would have jeopardized the sale of the property, but note that both Gaggero and BCC filed separate real-estate reporting solicitation forms to the escrow agent, showing that there were multiple transferors.  Both Gaggero and BCC were paid directly from the escrow for their respective ownership interests.  And the $9.6 million sale proceeds was allocated according to the Sale Agreement--$6.6 million to Gaggero, and $3 million to BCC.

[*28] II.    The Sale to BCC Followed by the Sale to Monticello

After concluding that Gaggero sold a partial interest in the property to BCC when its interest vested in February 1997, we now turn to the question of what, if any, capital gains Gaggero should have recognized from the transactions at issue here.  As we noted earlier, the fact that Gaggero sold a partial interest in the property to BCC doesn't necessarily mean the Commissioner loses.  The Commissioner has an alternative theory that Gaggero's sale of a partial ownership should trigger recognition of capital gain.  BCC, we have found, completed the development services it had contracted to perform in February 1997, and its ownership interest vested at that time.  The Commissioner insists that if Gaggero truly believed he had sold something to BCC, he needed to report that sale on his tax return.  Gaggero even said that Walters (his tax preparer) told him--as they were preparing for trial--that he should've told Gaggero to report a capital gain both from the disposition to BCC, and then again when the property was sold to Monticello.

Gaggero argues, however, that this was a harmless mistake because both Gaggero and BCC picked up the full capital gain in the same year at the same time--Gaggero reported $6.6 million and BCC reported $3 million.  And if no income was left unreported, disaggregating the large capital gain on the sale to

[*29] Monticello into two smaller ones would have no practical consequence on Gaggero's tax bill.

A closer look, however, reveals that Gaggero did indeed leave a slab of gain unreported on his return. Even if BCC reported $3 million of income in connection with the Monticello sale,[9] what's still missing is any reporting of the transfer from Gaggero to BCC. Gaggero seems to want the benefits of characterizing the February 1997 vesting as a sale to BCC (so he could report only a $6.6 million sales price from the Monticello transaction) without the

---

[9] Although BCC's 1997 tax return is not before us, we think that the $3 million that Gaggero argues that BCC reported as income from its interest in the Malibu property was realized when its interest vested on February 7, 1997, and not when the property was sold to Monticello the following month. Indeed, BCC reported only ordinary income--and no capital gain--on its tax return that year. Reporting the $3 million as ordinary income when its interest vested would be in accord with section 1.61-2(d)(1), Income Tax Regs., which says the fair market value of property acquired in exchange for services must be included as ordinary income by the party rendering the services. See also Weigl v. Commissioner, 84 T.C. 1192, 1231 (1985). That value would then become BCC's basis in the property. See Williams v. Commissioner, 37 T.C. 1099, 1106 (1962); Estate of Rogers v. Commissioner, T.C. Memo. 1970-192, 1970 WL 1737, aff'd, 445 F.2d 1020 (2d Cir. 1971). Assuming that BCC's services were valued at $3 million as of February 4, 1997 (we'll get to that dispute momentarily), when BCC received its partial interest in exchange for its services, it acquired a basis of $3 million in that partial interest. When BCC sold its partial interest to Monticello on March 27, 1997 and received $3 million in proceeds, it would not have had to report any capital gain since its amount realized and adjusted basis both would have been $3 million.

**[\*30]** corresponding burden of the gain that might arise from the BCC sale.  In short, Gaggero should have reported that sale.

We now must determine his gain from that sale.  To do that, we must calculate both Gaggero's amount realized and his adjusted basis in the interest sold.  First, we tackle the amount realized.

We start with the Code.  Gain realized from the sale or other disposition of property is taxed under section 61(a)(3).  The amount of gain realized is the excess of the amount realized over the adjusted basis.  Sec. 1001(a).  Section 1001 also tells us that the amount that Gaggero realized in disposing of a part-ownership of the house is the sum of the cash and the value of any property received.

The problem here is that BCC didn't give Gaggero cash or property in exchange for its interest; it gave its services in exchange for one-half of the increase in market value of the property which its work created (or at least contributed to).  This should be equal to what BCC received.  A party transferring property in exchange for services realizes gain to the extent the fair market value of the property transferred exceeds his adjusted basis in the property.  See United States v. Davis, 370 U.S. 65, 71-72 (1962) (transferring appreciated property to pay compensation is a taxable disposition of property for its fair market value);

**[*31]** <u>Riley v. Commissioner</u>, 37 T.C. 932, 937 (1962), <u>aff'd</u>, 328 F.2d 428 (5th Cir. 1964).

The Commissioner argues that if BCC made $3 million worth of improvements to the Malibu property (since that was the amount BCC received from the Monticello sale), then Gaggero conveyed an interest in the Malibu property worth $3 million to BCC in exchange for its services. Therefore, the Commissioner argues, Gaggero's amount realized should equal $3 million with respect to that conveyance.

Gaggero argues that the fair market value of the property when he transferred the part-ownership to BCC has to be determined by an appraisal of the property at the time BCC's interest vested. According to Gaggero, any "post-valuation date event would not be considered probative of the fair market value of the property transferred earlier." The trouble is that we have an appraisal of $6 million dated February 22, 1996 (almost a year before the work was finished), and an appraisal from March 10, 1997 (about a month after BCC finished its work and less than a month before the Monticello sale) that valued the sum of the two Malibu lots that Gaggero owned at $10 million. We don't have an appraisal of only the parcel at issue here as of February 4, 1997, the day BCC's interest vested. Gaggero and Walters, however, estimated the value of that parcel as of that date to

**[\*32]** be $6,600,000, which they calculated by taking 66% of the March 1997

appraisal of the combined values of both parcels ($10 million), which were both

sold to Monticello at about the same time for a total of $14.5 million.[10]  Based on a

$6.6 million valuation, to obtain the amount realized on the transfer to BCC,

Gaggero and Walters put forth--on the assumption that we find that there was a sale

to BCC--the following calculations:  First, subtract $3 million that was "reserved" to

Gaggero pursuant to the Sale Agreement, which reduces the amount to $3.6 million.

Then, multiply the $3.6 million by the 50% interest that BCC was to receive

according to the Sale Agreement.[11]  Thus, say Gaggero and Walters, if there was a

sale to BCC, Gaggero's amount realized from that sale should be $1.8 million.

We find that the Commissioner has the better position here.  We

acknowledge that the fair market value of the Malibu property on February 4, 1997

(when BCC's interest vested) wouldn't necessarily equal the $9.6 million

---

[10] The other Malibu lot sold for $4.9 million; therefore the sale proceeds from the Malibu property at issue here ($9.6 million) represent approximately 66-percent of total sale proceeds of $14.5 million.

[11] Specifically, the Sale Agreement provided that "[u]pon the sale or transfer of the Property, Buyer's fifty percent (50%) interest shall be calculated on the gross value of the entire property, less * * * real estate brokers commissions, legal fees, or other costs of sale agreed to between the parties, and less the sum of $3,000,000."

[*33] sales price agreed upon for that property on March 21, 1997 (which resulted in the $3 million sales price allocation to BCC at closing on March 27, 1997).[12]  We do, however, find that the amount allocated to BCC from the Monticello sale in March 1997 is highly probative of the fair market value of BCC's interest less than two months earlier.  See Polack v. Commissioner, 366 F.3d 608, 612 (8th Cir. 2004) ("[S]ubsequent events that shed light on what a willing buyer would have paid on the date in question are admissible, such as evidence of actual sales prices received for property after the date in question, so long as the sale occurred within a reasonable time * * * and no intervening events drastically changed the value of the property" (citation and internal quotation marks omitted)), aff'g T.C. Memo. 2002-145, 2002 WL 1284877; Estate of Noble v. Commissioner, T.C. Memo. 2005-2, 2005 WL 23303, at *10 ("An event occurring after a valuation date, even if unforeseeable as of the valuation date, * * * may be probative of the earlier

---

[12] According to Gaggero, BCC's $3 million allocation from the Monticello closing resulted from the following calculations:  (1) gross sales price of $9.6 million; (2) minus $600,000 that Gaggero estimated were the costs of the sale (he approximated $500,000 in commissions and $100,000 in other closing costs), which he allocated all to himself since he said he personally indemnified Monticello against those costs; (3) minus $3 million--"the first money out" according to Gaggero--pursuant to the Sale Agreement.  This leaves $6 million and, under the Sale Agreement, Gaggero and BCC should divide that amount 50/50.  (The $600,000 in estimated sales costs, we find, definitely affected the amount BCC received which we do find equaled $3 million.  They were not substantiated, however.  See infra p. 40 at note 14.)

[*34] valuation to the extent that it is relevant to establishing the amount that a hypothetical willing buyer would have paid a hypothetical willing seller * * * as of the valuation date"). This is especially true here, where the subsequent event--the Monticello sale--was reasonably foreseeable as of the valuation date; Monticello had made an offer to Gaggero before the time that BCC's interest vested. Indeed, we give the actual sales price allocated to BCC considerably more weight than the March 10, 1997 appraisal (which undervalued the properties by approximately $4.6 million) that Gaggero and Walters rely on to calculate their estimate of the amount Gaggero realized. Without any credible evidence to the contrary, we therefore find that the value of BCC's interest on February 4, 1997 was equal to the $3 million sales price that BCC received around March 27, 1997. Accordingly, we find that Gaggero's amount realized from the conveyance to BCC on February 4, 1997 was $3 million.

After determining amount realized, we now have to figure out Gaggero's adjusted basis in that partial interest at the time of the sale before we can calculate his realized gain. Real property's basis is usually its cost. Sec. 1012; sec. 1.1012-1(a), Income Tax Regs. The parties don't dispute that Gaggero's basis in the property before entering into the agreement with BCC was $689,000. But a taxpayer increases his adjusted basis by the cost of improvements that he made.

**[\*35]** Sec. 1016(a)(1); sec. 1.1016-2(a), Income Tax Regs. The parties stipulated that by the time the property was sold to Monticello, Gaggero's basis had increased to $2,167,000.[13] We need to allocate a portion of that basis to calculate Gaggero's realized gain on the interest he transferred to BCC. See sec. 1001; sec. 1.61-6(a), Income Tax Regs.; Sam Goldberger, Inc. v. Commissioner, 88 T.C. 1532, 1560 (1987); Hall v. Commissioner, T.C. Memo. 1993-198, 1993 WL 142899, at \*5.

Not surprisingly, the parties have significantly different views on the proper allocation of basis to Gaggero for the BCC sale. The Commissioner takes a hard-line approach. He argues that Gaggero's adjusted basis in the interest transferred to BCC should be zero because Gaggero didn't adequately substantiate his payment for the improvements. In contrast, Gaggero argues that--should we determine that he should've separately reported the transfer of the BCC interest--we should equitably allocate his $2,167,000 adjusted basis. Gaggero and Walters

---

[13] We agree with the parties that the fair market value of BCC's services to improve the property--which the Commissioner under his alternative theory acknowledges would be $3 million--should not be added to Gaggero's adjusted basis. See Hall v. Commissioner, T.C. Memo. 1993-198, 1993 WL 142899, at \*4 (determining that--after taxpayers sold a carpenter a 30% interest in a property in exchange for services the carpenter had rendered--"there [was] no legal support for adding the fair market value of the carpenter's services to the [taxpayers'] basis in the property").

[*36] contend that we should first divide $1.8 million (the proposed amount realized) by $6.6 million (the proposed valuation of the property as of February 4, 2007), which results in a ratio of approximately 27.3%. From there, Gaggero and Walters assert that we should multiply that ratio by the adjusted basis of $2.167 million, which amounts to $591,591. That number, they say, should be Gaggero's adjusted basis.

We agree with Gaggero to the extent he argues that he should be allocated some basis for the sale to BCC. We also agree that the starting point should be the $2.167 million adjusted basis. We disagree, however, with the other amounts he uses for his calculation. What fraction of the $2.167 million should Gaggero have allocated to the BCC sale? Since we allocated $3 million of the eventual $9.6 million Monticello sales price to Gaggero's amount realized for the BCC sale, we will use that same percentage to allocate to Gaggero's adjusted basis. The $3 million amount is 31.25% of $9.6 million. We then multiply 31.25% by $2.167 million, equaling $677,188--which we find is Gaggero's adjusted basis in the BCC sale. Having already found Gaggero's amount realized to be $3 million, that leaves him with a realized gain on his disposition to BCC of $2,322,812. So that leaves us with the start of a table:

| [*37] Sale | Date | Amount realized | Adjusted basis | Realized gain | Subject to sec. 1034? |
|---|---|---|---|---|---|
| Sale #1 (Gaggero to BCC) | 2/4/97 | $3,000,000 | $677,188 | $2,322,812 | ? |
| Sale #2 (Gaggero to Monticello) | 3/27/97 | ? | ? | ? | ? |

We still need to attach a few more legs to it before we apply the polish of the nonrecognition provisions of section 1034. We turn to the March 1997 sale to Monticello. We know the sales price Monticello paid: It was $9.6 million, $3 million of which was allocated to BCC. That leaves Gaggero with an amount realized of $6.6 million.[14] Having already determined how much of Gaggero's

---

[14] Of the $6.6 million, Gaggero testified--when discussing the calculation of the $3 million allocation to BCC from the Monticello sale--that he estimated there were $600,000 of costs in connection with that sale ($500,000 in commissions and $100,000 in other closing costs). A taxpayer may of course reduce his amount realized by costs and expenses of the property's disposition. See, e.g., sec. 1.263(a)-2(c), Income Tax Regs.; Ward v. Commissioner, 224 F.2d 547, 554-55 (9th Cir. 1955), aff'g 20 T.C. 332 (1953); see also sec. 1.1034-1(b)(4)(i), Income Tax Regs. Gaggero doesn't argue, however, that any such costs should lower his amount realized. Indeed, on his 1997 Form 2119, Gaggero reported $6.6 million as the sales price, but didn't report any amount in the line titled "Expense of Sale." Therefore--in this instance--we take him at his word and don't reduce the $6.6 million by any closing costs. (We think it possible, but need not decide, that the number was Gaggero's estimate of what it would take to settle a foreseeable dispute over commissions with a real-estate broker who was hovering near the deal. Gaggero testified that a lawsuit about this commission spanned "many, many

(continued...)

[*38] adjusted basis to allocate to the BCC sale, it's a bit easier to calculate that number for the Monticello sale (since there's no evidence of any increases to the basis between the time of the BCC sale and the Monticello sale). Using the adjusted basis amount of $2.167 million at the time of the BCC sale, and subtracting the $677,188 basis allocated to that sale, leaves Gaggero with an adjusted basis of $1,489,812. A $6.6 million amount realized results in a gain to Gaggero of $5,110,188. So now we have Gaggero's total realized gain from both sales.

| Sale | Date | Amount realized | Adjusted basis | Realized gain | Subject to sec. 1034? |
|------|------|-----------------|----------------|---------------|------------------------|
| Sale #1 (Gaggero to BCC) | 2/4/97 | $3,000,000 | $677,188 | $2,322,812 | ? |
| Sale #2 (Gaggero to Monticello) | 3/27/97 | 6,600,000 | 1,489,812 | 5,110,188 | ? |
| Total | | 9,600,000 | 2,167,000 | 7,433,000 | |

---

[14](...continued)
years." and Walters testified that a settlement wasn't reached until long after 1999. A cash-basis taxpayer in this position of uncertainty is allowed a deduction (as a capital loss) in the later year when he actually pays it out. See Estate of Shannonhouse v. Commissioner, 21 T.C. 422, 424 (1953).)

**[\*39]** III.  Application of Section 1034 to the Sales

Now knowing what Gaggero's realized gain is from those two transactions, we move on to determine how much of that gain should be recognized.  A realized gain is recognized unless one of the Code's nonrecognition provisions applies.  Sec. 1001(c); Cottage Sav. Ass'n v. Commissioner, 499 U.S. 554, 566 (1991).  Specifically, we need to address the not-so-straightforward question of whether we look to one or both of the sales transactions in determining how much realized gain qualifies for nonrecognition under section 1034.  To address that question, we start with the language of the statute and its background.

Before its repeal midway through 1997,[15] section 1034 said:

> If property (in this section called "old residence") used by the taxpayer as his principal residence is sold by him and, within a period beginning 2 years before the date of such sale and ending 2 years after such date, property (in this section called "new residence") is purchased and used by the taxpayer as his principal residence, gain (if any) from such sale *shall* be recognized only to the extent that the taxpayer's adjusted sales price * * * of the old residence exceeds the taxpayer's cost of purchasing the new residence**.**

Sec. 1034(a) (before the Taxpayer Relief Act of 1997 (TRA 1997), Pub. L. No. 105-34, sec. 312(b), 111 Stat. at 839) (emphasis added).  Thus, assuming a

_____

[15] The repeal of section 1034 applied to sales and exchanges made after May 6, 1997, with special rules for sales on or before August 5, 1997.  TRA 1997, sec. 312(b), (d), 111 Stat. at 839, 841.  Since both parties agree that no sale occurred after May 6, 1997, section 1034 applies.

**[\*40]** taxpayer bought a new principal residence within the statutory timeframe,
section 1034(a) provides that a taxpayer should completely defer recognition of gain
on the sale of his principal residence if the "adjusted sales price"[16] of that "old
residence" did not exceed the cost of purchasing the "new residence." See sec.
1034(a); sec. 1.1034-1(a), Income Tax Regs.; see also Bartley v. Commissioner,
T.C. Memo. 1998-322, 1998 WL 596446, at \*2 (noting that section 1034 is
mandatory, so that a taxpayer can't elect to have gain recognized where section
1034 is applicable). If the "adjusted sales price" of the "old residence" exceeded
the cost of the "new residence," however, the taxpayer would recognize gain on the
sale of the "old residence"--but only to the extent the "adjusted sales price" of the
"old residence" exceeded the cost of the "new residence." See sec. 1034(a) and
(b); sec. 1.1034-1(a), Income Tax Regs.

Now for a brief bit of history on that statute. Congress amended section 112
(the predecessor to section 1034) through the Revenue Act of 1951, Pub. L. No.

---

[16] The Code defines the term "adjusted sales price" as the amount realized on
the sale of an "old residence" reduced by certain nondeductible expenses related to
fixing up the residence in preparation for sale that aren't already taken into account
in computing the amount realized. Sec. 1034(b). Since Gaggero hasn't argued that
any of these additional expenses exist, there's no difference between amount
realized and adjusted sales price in this case.

**[*41]** 82-183, sec. 318, 65 Stat. at 494.[17]  See also Clapham v. Commissioner, 63

T.C. 505, 511 (1975).  Congress enacted the nonrecognition provisions in that

section because it was aware that the disposition of one residence and the

acquisition of another one were often prompted by a change in the size of a

taxpayer's family, a change in the taxpayer's place of employment, or other

circumstances beyond the taxpayer's control.  See S. Rept. No. 82-781, at 34-36

(1951), 1951 U.S.C.C.A.N. 1969, 2004-2006.  Although Congress was primarily

concerned with addressing relief from those situations, it also recognized that it

would be administratively burdensome to confine the section's application to those

circumstances, and thus extended relief to all residential sales that met the

requirements.  See id.

While both parties agree that section 1034 applies here, they disagree about

how to apply it.  Although neither party specifically says as much, the dispute

arises from what the term "old residence" means under section 1034(a).  By the

manner on which he reported the Monticello sale on his 1997 return, Gaggero took

---

[17] The only significant change between the nonrecognition rules in 1951 and 1997 was the extension of the period for acquisition or construction of a new residence from one year to eighteen months by the Tax Reduction Act of 1975, Pub. L. No. 94-12, sec. 207(a), 89 Stat. at 32, and then to two years by the Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, sec. 122(b), 95 Stat. at 197.  See Bartley v. Commissioner, T.C. Memo. 1998-322, 1998 WL 596446, at *4.

[*42] the position that his "old residence" for purposes of applying section 1034 was only the partial interest in the property he retained after the sale to BCC in February 1997 ($6.6 million). Under that logic, Gaggero believed that his entire claimed realized gain (claimed amount realized ($6.6 million) less claimed basis ($2.167 million)) qualified for nonrecognition under section 1034 because his "new residence," which the IRS has acknowledged cost $6.7 million, exceeded the "adjusted sales price" of what he claimed was his "old residence."

On the other hand, under his first theory (arguing no sale to BCC), the Commissioner asserts that the "adjusted sales price" of the "old residence" for purposes of section 1034 was $9.6 million. Under that calculation, since the "adjusted sales price" of Gaggero's "old residence" exceeded the cost of his "new residence" by $2.9 million, the Commissioner says that Gaggero should recognize a $2.9 million gain. Alternatively--even assuming there were a sale to BCC and then a sale to Monticello--the Commissioner says that we should adopt Gaggero's view that the transactions were "simultaneous event[s]," which the Commissioner says gets him to the same place as his "primary position." He argues that we should view the $3 million sale to BCC and the $6.6 million sale to Monticello as "simultaneous sales"--where both sales prices would be included for determining nonrecognition under section 1034. The Commissioner contends, in other words,

**[\*43]** that allowing Gaggero to use his sale to BCC "as a means [to] lower[] his receipts from the sale to Monticello, does not fall within the intended scope of [section] 1034;" and would only "encourage a taxpayer to strip away part of his interest in his residence in order to fully take advantage of its provisions."

Who has the better position on what should be the "adjusted sales price" of the "old residence"? We first look to the regulations, since the statute doesn't define the term "old residence." Under the regulations, an "old residence" is defined as "property used by the taxpayer as his principal residence which is the subject of a sale by him after December 31, 1953." Sec. 1.1034-1(b)(1), Income Tax Regs. The use of the phrase "a sale" doesn't definitively answer the question of whether an "old residence" could be disposed of via multiple sales, but it also doesn't foreclose the possibility. Although we've found very little authority to help us answer this question, we agree with the Commissioner that both the BCC and Monticello sales prices should be considered in determining the amount of gain that qualifies for nonrecognition under section 1034. We don't hold this because the sales were simultaneous but because both sales--although not simultaneous--were of Gaggero's "old residence." Congress enacted section 1034 (and its predecessor, section 112) to lift the tax burden that a taxpayer faced when he decided to move from a less expensive home to a more expensive one. That

**[*44]** just isn't the case here.  Gaggero moved from a home that was sold for $9.6 million to a home that cost him $6.7 million.  Although we're not suggesting that either Gaggero or Walters engaged in any funny business in structuring the sales transaction to reap the benefits of section 1034, we don't believe Congress intended for a taxpayer to have the ability to manipulate the sales price of his "old residence" by selling it in different pieces, thereby allowing him to take advantage of section 1034's nonrecognition provisions.

There is one tiny bit of authority out there that supports our interpretation of the term "old residence."  In Bogley v. Commissioner, 263 F.2d 746 (4th Cir. 1959), rev'g 30 T.C. 452 (1958), taxpayers acquired thirteen acres of land in 1939, constructed a residence on that land, and lived in that residence until December 1, 1950 when they moved to a new residence several miles away.  Id. at 746-47.  Before December 31, 1950, they sold the old home and three of the thirteen acres.  Id. at 747.  The following year, the taxpayers sold the other ten acres in two separate transactions.  Id.  The nonrecognition provisions of section 112 (added by the Revenue Act of 1951), however, applied only to residences that were sold after December 31, 1950.  See id.  Since the taxpayers sold the house and the three acres in December 1950 before section 112 became effective, they reported and paid capital gain tax on the difference between the sales price and their cost basis.

**[*45]** Id. However, when the taxpayers sold the remaining ten acres in 1951 (after the enactment of section 112), they didn't report the proceeds of those sales because they claimed that those ten acres were part of their "old residence" within the meaning of section 112. Id.

Although we had concluded that those ten acres weren't a part of the taxpayers' "old residence," Bogley, 30 T.C. at 454, and thus held they couldn't avail themselves of section 112's nonrecognition provisions, the Fourth Circuit reversed. It couldn't agree with such a "narrow reading of the statute," determining the "statute [did] not require the character of the [ten acres of unimproved land] to be determined in vacuo, ignoring what had gone before." Bogley, 263 F.2d at 747-48. Instead, the Fourth Circuit deemed that "[t]he thirteen acres intact were undoubtedly the taxpayers' 'old residence.'" Id. at 748. It went on to explain that "[t]here is no limitation in the statute, even by implication, that the old residence property must be sold in its entirety." Id. As "the character of the ten acres never changed * * * it was in reality part of the taxpayers' 'old residence.'"[18] Id. And since the taxpayers sold the ten acres

---

[18] We note that the question in Bogley centered on what was the "old residence," but also acknowledge that the Fourth Circuit didn't specifically address whether the "adjusted sales price" (actually called the "selling price" under section 112) of the taxpayer's "old residence" should have included the amount realized

(continued...)

**[*46]** within the statutory timeframe, the court concluded that they were entitled to the benefit of section 112's nonrecognition provisions.  Id.

Although a revenue ruling doesn't bind us, see Taproot Admin. Servs., Inc. v. Commissioner, 133 T.C. 202, 208-09 (2009), aff'd, 679 F.3d 1109 (9th Cir. 2012), one such ruling touching on a Bogley-like situation is also helpful here. In Rev. Rul. 76-541, 1976-2 C.B. 246, a taxpayer owned a principal residence on a ten-acre plot.  He then sold off pieces of that property at various times.  He first sold the house and three (of the ten) acres immediately surrounding the house together.  Later that year, he sold two of the other seven acres to another purchaser.  The taxpayer began construction of a new residence on the remaining five-acre portion before the sale of the two-acre plot, but didn't move into it until afterward.  He realized a gain from each of the sales transactions, but combined the gain from the sale of the old residence and three acres of land (the first sale) with the gain from the sale of the two-acre parcel (the

---

[18](...continued)
from the 1950 sale for purposes of determining what part of the 1951 gain qualified for nonrecognition.  In other words, the Bogley court only determined that the latter two sales were entitled to the benefit of the nonrecognition provisions of section 112.  It didn't explicitly say how much of the gain from those two sales qualified for nonrecognition under that section.

**[\*47]** second sale) and treated the combined gain as gain from the sale of the "old residence" under section 1034.[19]

Relying on <u>Bogley</u>, the IRS ruled that the taxpayer's sale of the house and three-acre portion before his sale of the two of the remaining seven acres "did not alter the character of the two acres." The IRS determined that the two-acre parcel remained part of the taxpayer's "old residence" for purposes of section 1034, and ruled that the nonrecognition provisions of section 1034 applied not only to the gain realized from the sale of the three-acre parcel containing the taxpayer's principal residence, but also to the gain realized from the subsequent sale of the two-acre parcel.[20]

We now turn back to the facts here. The first thing to note is that the facts in <u>Bogley</u> and Rev. Rul. 76-541 featured subsequent sales only of acreage without a structure, and not a subsequent sale of a partial interest in the structure itself. This is actually helpful in finding a solution to the present puzzle, because <u>Bogley</u>

---

[19] Since the cost of the taxpayer's "new residence" exceeded the total "adjusted sales price" of all of the property sales combined, the taxpayer reported that recognition of the combined gain from those sales should be deferred under section 1034.

[20] Although this ruling, like <u>Bogley</u>, didn't specifically say that the "adjusted sales price" of the "old residence" should have included the amount realized from all of the sales combined for purposes of determining what portion of the realized gains qualified for nonrecognition under section 1034, by ruling in the taxpayer's favor, it implicitly endorsed that notion.

**[*48]** led to a T.C. Opinion, and though it was reversed on appeal, the appeal was to a different circuit than the one this case would presumably go to.  As a reviewed Opinion, <u>Bogley</u> remains good law in our Court unless a case is to be appealed to the Fourth Circuit; this case is not.   <u>See</u> <u>Golsen v. Commissioner</u>, 54 T.C. 742, 757 (1970), <u>aff'd</u>, 445 F.2d 985 (10th Cir. 1971).  That means that we have to follow the rule we ourselves laid down in <u>Bogley</u>, and not what the Fourth Circuit ruled.

Except that our holding in <u>Bogley</u> was that "unimproved land upon which [the taxpayers] did not reside" was not their "old residence."  <u>See</u> 30 T.C. at 454.  That holding isn't applicable to the facts of Gaggero's case.  Here we have two partial sales of an actual structure in which Gaggero resided.  Our holding in <u>Bogley</u> is distinguishable, and we do distinguish it to fit these facts.  We also recognize that the taxpayers in <u>Bogley</u> and Rev. Rul. 76-541 (arguing for a *subsequent* sale to be characterized as part of the "old residence") sought the opposite result that Gaggero does here (arguing that a *prior* sale should *not* be characterized as part of the "old residence").  Nonetheless, we find the underlying principle from <u>Bogley</u> and Rev. Rul. 76-541--that the nonrecognition provisions of section 1034 (and its predecessor) can apply to more than one sale if a primary residence is sold in parts--persuasive in the situation we are presented with in this

[*49] case.  The fact that Gaggero sold a partial interest in his primary residence to BCC before selling the rest of his interest in Monticello approximately six weeks later didn't alter the character of the preceding interest sold to BCC.  We therefore conclude  that the entire Malibu property--including the interest Gaggero sold to BCC--was "undoubtedly" Gaggero's "old residence" for section 1034 purposes as both sales of the property were sold within two years of Gaggero purchasing his new residence.  Bogley, 263 F.2d at 748.  To conclude otherwise would be an impermissible "narrow reading of the statute."  Id. at 747.  Section 1034 doesn't require the character of the partial interest sold to BCC to "be determined in vacuo," ignoring what took place six weeks later (and in the same taxable year).  Id. at 748.  Since neither the character of the partial interest Gaggero sold to BCC nor the character of the remainder of that interest he sold to Monticello ever changed, we believe they were both "in reality" part of Gaggero's "old residence."  Id.  Therefore, since both transfers were of Gaggero's "old residence," we conclude that for purposes of the nonrecognition provisions of section 1034 both the sale to BCC and the sale to Monticello ($6.6 million) should be included to calculate the "adjusted sales price" of that "old residence."[21]

---

[21] We do not believe that concluding that there were two separate sales for the purposes of determining realized gain precludes us from also concluding that

(continued...)

**[\*50]**   Our table is finished:

| Sale | Date | Amount realized | Adjusted basis | Realized gain | Subject to sec. 1034? |
|---|---|---|---|---|---|
| Sale #1 (Gaggero to BCC) | 2/4/97 | $3,000,000 | $677,188 | $2,322,812 | Yes |
| Sale #2 (Gaggero to Monticello) | 3/27/97 | 6,600,000 | 1,489,812 | 5,110,188 | Yes |
| Total | | 9,600,000 | 2,167,000 | 7,433,000 | |

All that's left is one more bit of math.  Gaggero's "adjusted sales price" in his "old residence" ($9.6 million) exceeded the cost of his new residence ($6.7 million). Gaggero should have recognized a gain in 1997 of the difference, equal to $2.9 million.

IV.   Penalties

The Commissioner imposed penalties under section 6662 based on a substantial understatement of tax because Gaggero's 1997's tax return reported no tax due and the determined deficiency totaled more than $180,000.

---

[21](...continued)
sales price from both of those sales are part of Gaggero's "old residence" for purposes of applying the provisions of section 1034.  The former issue is one of realization of gain, the latter asks how much of that realized gain should be recognized.

**[*51]** Penalties under section 6662 are subject to the defense of reasonable, good-faith reliance on professional advice. Sec. 6664(c)(1); see also sec. 1.6664-4(a), Income Tax Regs.; Higbee v. Commissioner, 116 T.C. 438, 448 [*51] (2001). Whether the taxpayer acted with reasonable cause and in good faith depends upon all the pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs. Generally, a taxpayer must show that: (1) the adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also Estate of La Meres v. Commissioner, 98 T.C. 294, 315-16 (1992).

Gaggero argues that he reasonably relied in good faith on Walters all the way from the structuring of the Sale Agreement with BCC through the reporting of the sale to Monticello on his tax return. We find by an abundance of evidence that Gaggero did rely on Walters. We also find that Walters would appear to someone of Gaggero's experience and education--and actually was from any objective viewpoint--a thoroughly qualified professional adviser. Walters has been a CPA since 1978 and has been with the firm of Kellogg & Andelson since 1975. K&A is ranked 18th among accounting firms in Southern California, has been in

[*52] business since 1939, and has approximately 100 employees.  Both K&A and Walters had experience with real-property transfers when K&A drafted the Sale Agreement and Development Contract.  K&A and Walters had extensive experience with these type of owner-developer real-estate transactions--they have put them together, drafted the necessary agreements, and prepared the tax returns on which these deals are reported.  Many of K&A's other clients are real-estate developers and owners.  Gaggero had been a client of K&A since 1984 and K&A has done all of Gaggero's and BCC's tax work since that then.  We also find that Gaggero provided Walters and K&A with all the information they needed or asked for and that he actually followed their advice.

But the Commissioner argues that even if Gaggero proved reliance, he didn't show that his reliance was in good faith.  See ASAT, Inc. v. Commissioner, 108 T.C. 147, 176 (1997) (mere shifting of responsibility to the tax preparer does not relieve a taxpayer from liability for the accuracy-related penalty (citing Enoch v. Commissioner, 57 T.C. 781, 802 (1972))).  We acknowledge that Gaggero's practical knowledge is unusual compared to his education.  Though he never graduated from high school, his experience and skills have given him a keen understanding of the world.  For example, during trial he didn't hesitate to question his attorney's advice, suggested cross-examination questions, and

**[*53]** showed a deep understanding of the concept of tax basis in forming his own opinion on the IRS's approach on reporting the capital gain. This worldly understanding, according to the Commissioner, made him consciously aware that the tax consequences of the transaction were "too good to be true." Sec. 1.6662-3(b)(1), Income Tax Regs.; see also sec. 1.6664-4(b)(1), Income Tax Regs. ("Generally, the most important factor [under the facts and circumstances test in determining reasonable, good-faith reliance] is the extent of taxpayer's effort to assess the taxpayer's proper tax liability"). The Commissioner even argues that Gaggero may have carefully planned to file the erroneous return intending to claim ignorance if caught.

We disagree. Our impression of Gaggero during the trial was of an honest craftsman who followed professional advice of his long-term consultants, a man who had to fight the IRS and then learn the case well enough to be familiar with the terms of the somewhat obscure issues that it raised.

The Commissioner insists, however, that Gaggero's behavior before and after filing the return precludes any finding he was acting in good faith. He argues that Gaggero created two sets of documents for the sale to Monticello--one for the parties to the sale, and one for the IRS. He pointedly argues that Gaggero's contradictory descriptions of the house's ownership during the closing with

[*54] Monticello do not correspond with an honest belief that he had actually transferred an interest in his property to BCC before the sale to Monticello. The Commissioner also argues that Gaggero hid the sale to BCC from Monticello, his own real-estate attorney, and the local tax collector. He argues that Gaggero's signature on the purchase agreement with Monticello certified he had not executed any other sales contract for the sale of the property, effectively denying the existence of the Sale Agreement and even contradicting it. And he points out that Gaggero stated twice in the owner's declaration that no other persons asserted ownership in the property and delivered that declaration to Chicago Title Insurance Company. The deed to Monticello and the estimated settlement statement do not mention the terms of the Sale Agreement. And Gaggero explained that his full ownership of BCC made only the essence of his declaration true--"There is nobody out there that I'm aware of that's going to make a run at this property other than that which I represent." This, the Commissioner contends, amounts to Gaggero's admission that he prepared two mutually exclusive versions of the same transaction, which indicates lack of good faith.

Well. The problem here for the Commissioner is that we're not looking at Gaggero's good faith in the transaction as a whole--where he had to deal with a hard-nosed third party in Monticello and what seems to have been a very

[*55] contentious relationship with a real-estate broker who wanted by turns to profit from the deal or torpedo it. We're looking instead at whether he reasonably relied in good faith on the advice of his professional tax adviser. And with both Walters specifically and K&A more generally, Gaggero made sure he was honest and completely forthcoming and that he followed their advice.

Gaggero consulted with K&A about the allocation of the sale price between BCC and himself. K&A, and in particular Walters, were expert tax advisers and competent in the tax matters at issue in this case. It was K&A who advised Gaggero how to report the transaction and to roll over the sale proceeds into another personal residence so that the gains from the sale would qualify for deferral under section 1034. The fact that the transaction began six years before its reporting reinforces our belief it had true and genuine economic substance, and we attribute the partial inaccuracy of the reporting as due solely to Gaggero's tax preparer.

We agree with the Commissioner on the amount of the gain that Gaggero must recognize, but do not sustain the penalty, so

Decision will be entered

under Rule 155.